UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

EDDY MARTE and LUIS MARTE,              :
                                        :
                    Petitioners,        :
                                        :
     -against-                          :
                                        :
CAROL BERKMAN, Justice of the           :     No. 11 Civ. 6082 (JFK)
Supreme Court, State of New York,       :     **Opinion and Order**
County of New York, SUPREME COURT,      :
STATE OF NEW YORK, COUNTY OF NEW        :
YORK, and CYRUS R. VANCE, District      :
Attorney for the County of New          :
York,                                   :
                                        :
                    Respondents.        :
----------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 10-18-11 _____

APPEARANCES:

     For Petitioners:
     David Segal, Esq.
     Robert Blossner, Esq.

     For Respondents:
     Cyrus R. Vance, Jr., District Attorney for New York County
          Of Counsel:    Martin J. Foncello, Esq.

**JOHN F. KEENAN, United States District Judge:**

     Before the Court is Eddy and Luis Marte's (collectively,

"Petitioners") petition for a pre-trial writ of habeas corpus,

pursuant to 28 U.S.C. § 2254, and accompanying request, pursuant

to 28 U.S.C. § 2251, to stay criminal proceedings in the Supreme

Court of the State of New York.  For the reasons that follow,

the petition is denied, and the application for a stay is denied

as moot.

## I.      Background

### A.   New York Supreme Court Trial

In a New York Supreme Court indictment dated May 12, 2008, Eddy and Luis Marte were charged with one count of attempted robbery in the first degree and two counts of attempted robbery in the second degree.  A jury trial before the Honorable John Cataldo commenced on February 19, 2009.  At trial, the People endeavored to prove that Eddy Marte paid an employee $16,000 to withdraw a worker's compensation claim, and that once the claim was withdrawn, Eddy Marte displayed a gun and demanded return of the $16,000 payment.  The People also sought to prove that when the employee tried to flee, Luis Marte chased him into a bodega and assaulted him.  On Thursday, March 5, 2009, the court submitted the case to the jury.  Along with the three counts in the indictment, the court submitted for each count the lesser included offense of attempted robbery in the third degree. (A4).[1]  During deliberations on March 5, 2009, the jury sent several notes requesting further explanation of the charges, readbacks of testimony, and exhibits.  (A5-A9).  The jury did not reach a verdict that day.

Deliberations resumed on Friday, March 6, 2009.  The jury sent back two notes at 11:15 a.m. requesting additional exhibits, readback of testimony, and legal instruction.  (A10-

---

[1] Citations to "A-" refer to Respondents' appendix of exhibits.

A11).  Before the court had responded to those notes, the jury

sent another note at 11:50 a.m. informing the court that:

> We are decided about 1 count.  We are very close to a
> decision on another.  We are evenly split on the
> remaining counts and are at an impasse, barring the
> testimony & items we have requested.  We request
> guidance.

(A12).  The court shared the contents of the note with counsel

and solicited their input on how to respond.  Counsel told the

court that "we have conferred with the defendants, and we will

accept a partial verdict at this time."  (A20).  The court

declined to take a partial verdict and instructed the jury to

continue deliberating.  (A23).  At 12:20 p.m., the jury sent

another note stating:

> We need clarification on how the 3rd degree attempted
> robbery charge applies on the separate charges,
> particularly for those of us who believe one or more
> defendants are guilty on some counts and not guilty on
> others.

(A13).  The court conferred with counsel and then gave the

requested instruction.  (A25-A28).

Juror No. 2 had previously informed the court of a plane

trip, and the parties stipulated that if the jury had not

reached a verdict by 1:00 p.m. on Friday, March 6, 2009, the

only remaining alternate would be substituted for Juror No. 2.

At approximately 12:40 p.m., the court confirmed that Juror No.

2 could not continue deliberating past 1:00 p.m. and, in

accordance with the parties' agreement, seated the alternate in

Juror No. 2's place.  (A28-A29).  The court instructed the jury
to "begin deliberations anew" as "[y]ou are not bound by the
determination that you made [when Juror No. 2] was part of that
jury."  (A30).  Counsel then objected for the record to the
court's decision not to take a partial verdict prior to
dismissing Juror No. 2.  (A31-A37).

Soon after, two jurors asked to speak with the trial judge.
Juror No. 3 said that he was going to Philadelphia on Sunday and
would not return until Tuesday, March 10, 2009.  However, the
court informed the juror that "you're going to have to come back
and be available for Monday at 9:30 should you not reach a
determination by the end of the day.  I'll hold everybody until
six o'clock, if that's possible, but I'm going to have to have
you return."  (A39).  Similarly, Juror No. 8 told the judge that
he could not serve the following week because he planned to
attend a conference in San Diego.  The judge repeated that since
there were no remaining alternates, Juror No. 8 would be
required to appear on Monday, March 9, 2009 to resume
deliberations if the jury did not reach a verdict that day.
(A41-A42).

Around the end of the day on Friday, March 6, 2009, the
jury sent back two final notes.  The first note, which did not
bear a time, stated:  "We are unanimous on 2 charges of 6.  We
are at an impasse on 4 charges of 6."  (A17).  The judge

4

informed counsel that the jury had reached a verdict as to two
of the counts, but, in the judge's words, were "deadlocked" on
the third count.  (A43).  The second note, sent at 5:23 p.m.,
renewed Juror No. 8's request to be released from jury duty to
attend the conference in San Diego.  (A18).  After conducting a
conference with counsel pursuant to People v. O'Rama, 579 N.E.2d
189 (N.Y. 1991), to discuss how the court should respond to the
jury's notes, the following exchange took place:

> THE COURT:  My inclination is to take the verdict and
> declare a mistrial as to the other charges.
>
> [The prosecutor]:  I guess that sounds like where
> we're going, Judge.
>
> THE COURT:  Do counsel want to be heard?
>
> [Counsel for Eddy Marte]:  No.
>
> THE COURT:  Okay.  If there is nothing else, we'll
> bring them in.
>
> COURT OFFICER:  Yes, Judge.
>
> [Counsel for Eddy Marte]:  Judge, you'll take a
> partial?
>
> THE COURT:  I'll take a partial verdict.

(A43).  The court proceeded to take not guilty verdicts on
Counts One and Two as to both Eddy and Luis Marte.  (A44-A47).
After recording the partial verdict, the court inquired,
"Counsel, anything for the record?"  (A47).  The prosecutor
replied, "Nothing for the record, Your Honor."  (Id.).  Both
defense counsel were silent.

Justice Cataldo then addressed the jury:

> All right.  I want to thank you very much.  I know we
> kept you much longer than I originally indicated it
> would take.  I think you've performed an excellent
> service, clearly by virtue of your notes and your
> attention that you have truly become involved in this
> case in its determination.  So, thanks very much.
> Have a good weekend.

(Id.).  The court officer then said, "Jury exiting."  (Id.).

Once the lawyers, the defendants, and the court were

"[o]utside the presence of the jury," counsel for Luis Marte got

the judge's attention, and the court responded, "You want them

held?"  (Id.).  Counsel for Eddy Marte answered, "I think for a

moment, yes."  (A48).  The court said, "Okay.  So let's hold

them."  (Id.).  The record does not indicate whether the court

officer was able to successfully retrieve the jurors.

After a sidebar conference off the record, the following

exchange took place:

> THE COURT:  So, that the record is clear, I'm
> declaring a mistrial as to Count Three.
>
> [Counsel for Eddy Marte]:  Judge, we're not-- we don't
> consent to the mistrial on Count Three.  So, that the
> record is clear, we're not consenting to a mistrial
> because they could have stayed until Monday.  There is
> no question about it, because that was the intention,
> if they hadn't reached--
>
> THE COURT:  -- [Juror No. 8] indicated that -- first
> of all, there was an impasse; the second wasn't [sic];
> and also that he could not be here on Monday because
> he had a plane trip.
>
> [Counsel for Eddy Marte]:  That's correct, but what
> I'm saying is you could have given them an Allen

6

charge on Monday in the impasse.  There is no question about that.  We have to protect the record.

THE COURT:  I understand that.  I gave them an abbreviated Allen charge.

[Counsel for Eddy Marte]:  But, it kept going; it needed a full Allen charge.  We're not consenting to that.

THE COURT:  I understand.

[Counsel for Luis Marte]:  Of course, Your Honor. [Juror No. 8] cannot excuse himself.  It has to be by the Court.

THE COURT:  Yes.  I think his participation – the time of his participation and his schedule plans justify that.

[Counsel for Eddy Marte]:  The other thing is, if we consented to [Juror No. 8] leaving, the question is, would we consent to 11 out of 12 in deciding the case? I believe [counsel for Luis Marte] and I would agree, that we would consent if you kept 11 out of 12.

THE COURT:  I don't think you can consent to that.

. . . .

THE COURT:  Okay.  Fine.  I still find that it was an impasse; and they're excused, over your objection.

(A48–A49).  The case was then sent to the calendar part to schedule a retrial on Count Three.  (A50).

## B.   Article 78 Proceedings

Eddy and Luis Marte subsequently moved to dismiss the indictment on the ground that retrial would violate the constitutional protection against double jeopardy.  On June 1, 2009, Justice Berkman denied the motion, finding that the

mistrial was manifestly necessary because the trial court was
persuaded that the jurors were at an impasse, and, in any event,
the defendants failed to timely object to the declaration of a
mistrial. (A51-A53). Defendants' motion for reconsideration of
the June 1, 2009 decision was denied on August 13, 2009. (A54).
Petitioners then initiated a proceeding pursuant to N.Y.
C.P.L.R. Article 78 in the New York Supreme Court, Appellate
Division, First Department, seeking to bar the retrial on the
previously articulated double jeopardy grounds. In an opinion
dated February 16, 2010, the Appellate Division dismissed the
Article 78 proceeding. See Marte v. Berkman, 895 N.Y.S.2d 376
(N.Y. App. Div. 2010). There was no majority opinion in the
February 16, 2010 dismissal. Two concurring justices found that
there was no manifest necessity for a mistrial, but "the need
for manifest necessity for the mistrial was obviated by
petitioners' consent, which can be implied from the
circumstances." Id. at 377. Two separately concurring justices
agreed that Petitioners implicitly consented to the mistrial,
but also found that the trial judge acted within his discretion
in declaring a mistrial. Id. at 378-81. The fifth justice on
the panel dissented, finding no implied consent or manifest
necessity for the mistrial. Id. at 382-87.

Petitioners were granted leave to appeal the February 16,
2010 dismissal to the New York Court of Appeals. In an opinion

dated May 5, 2011, the Court of Appeals affirmed the judgment of the Appellate Division. Marte v. Berkman, 949 N.E.2d 479 (N.Y. 2011). The majority found "record support for the Appellate Division conclusion that defendants impliedly consented to the mistrial" in counsel's failure to speak, despite not one, but two opportunities to voice an objection on the record. Id. at 480. The Court noted:

> If defendants believed, as they now assert, that the court should have taken the partial verdict followed by an Allen charge directing the jury to continue deliberations, the time to offer that suggestion was at the O'Rama conference. Similarly, if defense counsel were unprepared to consent or object to a mistrial during the conference because they did not yet know what the verdict would be, this too should have been conveyed to the court at the conference. This would have put the court on notice that the defense did not agree that the tenor and length of deliberations, coupled with the jury's declaration concerning its inability to reach agreement, warranted a mistrial . . . . Certainly, once the verdict was announced and defense counsel nonetheless remained mute when asked their views, the inference that defense counsel concurred with the court's decision to grant a mistrial was even more apparent.

Id. at 481. The majority did not reach the question of whether the mistrial was manifestly necessary. Two judges dissented on the grounds that there was no manifest necessity for a mistrial and that Petitioners' consent to the mistrial could not be implied from the record. With respect to counsel's silence at the O'Rama conference, the dissent believed

> [i]t was not obvious . . . that the court's next step would be to declare a mistrial without further

> inquiry.  That only became evident when the court
> proceeded to briefly thank the jurors and discharge
> them.  The court never gave defense counsel an
> opportunity to respond to its decision to declare a
> mistrial, and defendants, petitioners here, cannot be
> said to have implicitly consented.

Id. at 482 (Ciparick, J., dissenting).  Similarly, with respect
to counsel's silence after the trial judge took a partial
verdict, the dissent posited that "[a]lthough defense counsel
here must have realized at some point while the court was
thanking and dismissing the jury that there would be no verdict
on the third count, that is not the type of silence in the face
of a clear opportunity for consent that may substitute for
explicit consent."  Id.  Finally, the dissent construed
counsel's objection, made after the jury had been discharged, as
timely.  Id.

Finding no relief in the state courts, Petitioners now turn
to the federal court for a pre-trial writ of habeas corpus
halting their impending attempted robbery retrial.  A firm
retrial date is to be scheduled at a conference on October 19,
2011.  The Martes are currently released on bail.

## II.    Discussion

### A.   Standard of Review

The Court's first task is to determine the proper
jurisdictional framework for analyzing Petitioners' claim.  The
instant petition was originally filed pursuant to 28 U.S.C. §

10

2254.  Section 2254(d) contemplates habeas relief for persons
"in custody pursuant to the judgment of a State court."  A
petitioner need not be physically confined in order to satisfy §
2254's custody requirement, and courts have allowed petitioners
on bail, parole, and supervised release to pursue habeas
petitions.  See Hensley v. Municipal Court, 411 U.S. 345, 351
(1973) (holding that a petitioner who has been released on his
own recognizance pending execution of his sentence is "in
custody" within the meaning of § 2241 and § 2254 because he is
"subject to restraints not shared by the public generally"
(internal quotation omitted)); Jones v. Cunningham, 371 U.S.
236, 243 (1963) ("While petitioner's parole releases him from
immediate physical imprisonment, it imposes conditions which
significantly confine and restrain his freedom; this is enough
to keep him in the 'custody' of the members of the Virginia
Parole Board within the meaning of the habeas corpus statute.");
Earley v. Murray, 451 F.3d 71, 75 (2d Cir. 2006) ("Post-release
supervision, admitting of the possibility of revocation and
additional jail time, is considered to be 'custody.'"); United
States v. Arthur, 367 F.3d 119, 121 (2d Cir. 2004) ("It is clear
that, even though he is not presently imprisoned, [petitioner]
is in custody and thus capable of seeking habeas relief.").
Thus, it is undisputed that Petitioners are "in custody" for the

purpose of the habeas statute by virtue of their bail conditions.

Petitioners are not, however, in custody "pursuant to the judgment of a State court" as they were acquitted of two attempted robbery charges and have yet to be tried again on the third. In at least one case, the Second Circuit has recognized that § 2241 is available to state pre-trial detainees. <u>See United States ex rel. Scranton v. New York</u>, 532 F.2d 292, 293 (2d Cir. 1976) (treating pre-trial application to bar state court retrial following a mistrial on speedy trial grounds as a § 2241 petition). Indeed, in factually analogous cases where there is no judgment of conviction, numerous other courts have construed state pre-trial habeas petitions as applications arising under the general habeas statute. <u>See, e.g.</u>, <u>Klein v. Leis</u>, 548 F.3d 425, 430 n.1 (6th Cir. 2008) (application to bar state court re-trial following a mistrial on double jeopardy grounds "was promptly converted to one arising under § 2241, though the magistrate and the district judge ultimately applied the review standards contained in § 2254"); <u>Walck v. Edmondson</u>, 472 F.3d 1227, 1235 (10th Cir. 2007) (holding that "§ 2241 is the proper avenue by which to challenge pretrial detention, including when such challenges are based on double jeopardy grounds" where petitioner "is neither challenging a state conviction nor sentence and, as a result, § 2254 is

12

inapplicable"); Stow v. Murashige, 389 F.3d 880, 885 (9th Cir. 2004) ("[B]ecause [petitioner] was not 'in custody pursuant to the judgment of a State court' at the time he filed his petition, the threshold requirement for § 2254, we join four of our sister circuits in holding that [petitioner's] habeas petition which raised a double jeopardy challenge to his pending retrial is properly treated under § 2241."); Jacobs v. McCaughtry, 251 F.3d 596, 597 (7th Cir. 2001) (per curiam); Stringer v. Williams, 161 F.3d 259, 262 (5th Cir. 1998).  As § 2241 by its terms requires only that a petitioner be "in custody in violation of the Constitution or laws or treaties of the United States," without reference to a state court judgment, the instant § 2254 petition is more appropriately considered an application pursuant to § 2241.

Although exhaustion of state remedies is not statutorily required under § 2241, "decisional law has superimposed such a requirement in order to accommodate principles of federalism." Scranton, 532 F.2d at 294; see Drayton v. Hayes, 589 F.2d 117, 120 (2d Cir. 1979) (requiring pre-trial habeas detainee to satisfy § 2254's exhaustion requirement).  In that respect, at least, § 2241 and § 2254 are indistinguishable.  See Foster v. Murphy, 686 F. Supp. 471, 474 (S.D.N.Y. 1988) ("Construing their complaint as a petition for habeas corpus imposes a requirement that plaintiffs have exhausted their state remedies.  This is so

13

whether their petition is considered as brought under 28 U.S.C. § 2254, which imposes the exhaustion requirement by statute or under 28 U.S.C. § 2241, upon which courts have engrafted a requirement of exhaustion."). It is undisputed that Petitioners exhausted their double jeopardy claim through the state court motion to dismiss the indictment, Article 78 proceeding, and subsequent appeals to the Appellate Division and New York Court of Appeals. As Petitioners' claim is properly before this Court, the next step is to determine the appropriate standard of review.

Surprisingly, neither party has cited to any Second Circuit authority regarding the standard of review for a state pre-trial detainee's § 2241 habeas petition, and the Court's research has unearthed little guidance. Section 2241 itself does not define the limits of a court's review of state or federal habeas petitions. Respondents argue that § 2241 should borrow § 2254's deferential standard of review in addition to its exhaustion requirement. That position finds no support in the statute itself or in the caselaw. With the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress amended § 2254 to impose the more stringent "contrary to or unreasonable application of clearly established federal law" standard of review on state habeas petitions, but left § 2241 untouched. See Pub. L. No. 104-132, 110 Stat. 1214 (1996); Martinez v.

14

<u>Caldwell</u>, 644 F.3d 238, 242 (5th Cir. 2011) ("The plain language of the statutes clearly demonstrates that § 2254 is textually distinct from § 2241: one explicitly mandates deference, the other does not."). Where Congress had the opportunity to make an identical amendment to § 2241 with respect to state petitioners, but did not, the Court cannot conclude that Congress would sanction the borrowing of § 2254's standard of review advocated by Respondents. See <u>Duncan v. Walker</u>, 533 U.S. 167, 173 (2001) (holding that where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations and internal quotation marks omitted)).

Four circuits have applied the pre-AEDPA standard to pre-trial habeas petitions challenging state prosecution on double jeopardy grounds, reviewing conclusions of law <u>de</u> <u>novo</u>. See <u>Martinez</u>, 644 F.3d at 242; <u>Walck</u>, 472 F.3d at 1235; <u>Stow</u>, 389 F.3d at 888; <u>Gonzalez v. Justices of Mun. Court of Boston</u>, 382 F.3d 1, 7 (1st Cir. 2004), <u>vacated on other grounds</u>, 544 U.S. 918 (2005). Moreover, application of the pre-AEDPA standard is not contrary to Second Circuit authority. Although written in the context of successive post-trial habeas applications challenging execution of state sentences, the Court of Appeals

has held that "AEDPA applies to petitions brought under the post-conviction remedy statutes, 28 U.S.C. §§ 2254 and 2255, but not to petitions brought under the traditional habeas statute, 28 U.S.C. § 2241." James v. Walsh, 308 F.3d 162, 166 (2d Cir. 2002).

Additionally, in Drayton v. Hayes, a factually similar case admittedly decided long before the passage of AEDPA, the Court of Appeals recognized a federal court's extraordinary power to disrupt a state prosecution to prevent a double jeopardy violation even though a petitioner has unsuccessfully pursued and exhausted his claim in the state courts.  589 F.2d at 120. The Court noted that "once the petitioner has exhausted his state remedies, there is no further bar to the assumption of federal jurisdiction, for the deference owed to the state judicial system demanded by principles of comity and federalism has been paid."  Id.  Yet, limiting the federal court's power under § 2241 to cases where the state court decision is contrary to or an unreasonable application of clearly established federal double jeopardy law is tantamount to a policy of abstention. Thus, the fact that this Circuit considers the abstention doctrine of Younger v. Harris, 401 U.S. 37 (1971), to be "simply inapposite" in the double jeopardy context lends further support to the application of a non-deferential standard of review.  Id. at 121 n.7.

Respondents also suggest that Petitioners have consented to application of AEDPA's deferential standard of review by filing their petition pursuant to § 2254 instead of § 2241. The Sixth Circuit has followed this path of least resistance, see Klein, 548 F.3d at 430 n.4 (assuming that AEDPA deference applied where "the applicability of AEDPA has not been challenged"), but this Court declines to hold that a petitioner can impliedly consent to a standard of review. Moreover, at oral argument, both parties agreed that § 2241 is equally applicable to the double jeopardy claim. Thus, the Court reviews Petitioners' claim outside the confines of AEDPA. "Absent AEDPA deference, conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." DeBerry v. Portuondo, 403 F.3d 57, 67 (2d Cir. 2005). Clearly, although the Court applies a pre-AEDPA standard of review, Petitioners' claim would similarly fail if the New York Court of Appeals' adjudication were reviewed deferentially.

## B.   Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment safeguards a defendant's "valued right to have his trial completed by a particular tribunal." Arizona v. Washington, 434 U.S. 497, 503 (1978). However, "[u]nlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is

terminated without finally resolving the merits of the charges against the accused." Id. at 505.  Instead, there is no double jeopardy bar to retrial where:  (1) there is "manifest necessity" for a mistrial granted over the defendant's objection; or (2) the defendant requested or consented to the mistrial.  See id.; United States v. Dinitz, 424 U.S. 600, 606-08 (1976); Maula v. Freckleton, 972 F.2d 27, 29 (2d Cir. 1992) ("No 'manifest necessity' analysis is required, however, when a defendant requests a mistrial, or consents to one.").

In this Circuit, "[c]onsent [to a mistrial] need not be express, but may be implied from the totality of circumstances attendant on a declaration of mistrial." United States v. Goldstein, 479 F.2d 1061, 1067 (2d Cir. 1973); see United States v. Bright, 356 F. App'x 474, 476 (2d Cir. 2009).  Relevant considerations include whether defendant was given an opportunity to object to a mistrial, but failed to act.  See Maula, 972 F.2d at 29 ("Inferring consent from counsel's failure to object in this case is not only consistent with the requirements of the double jeopardy clause; it also tracks the general principle applied in other areas of trial practice, when failure to object to a ruling, which at the time it is made or proposed could readily be changed, will bar future attempts to

review that ruling."); <u>United States v. Beckerman</u>, 516 F.2d 905, 909 (2d Cir. 1975).[2]

For example, in <u>Goldstein</u>, the jury sent a note that it had reached a verdict on one count, but could not reach a unanimous verdict on seventeen other counts.  479 F.2d at 1063.  The trial court gave a modified <u>Allen</u> charge, and the defense moved for a mistrial, which was denied.  <u>Id.</u>  Two hours later, the jury sent another note confirming that one holdout juror was hindering a guilty verdict on the remaining seventeen counts.  <u>Id.</u>  At this point, defense counsel realized they had a hung jury, but, for whatever reason, no longer wished for a mistrial.  <u>Id.</u> at 1066.  However, despite opportunities to voice their newfound opposition to the mistrial (1) when the court informed counsel of the second note, (2) during the jury polling as to the verdict on one count, and (3) during the court's subsequent colloquy with the jury about the case, defense counsel never objected to the declaration of a mistrial.  <u>Id.</u>  Consequently, the Court of Appeals rejected defendant's argument that the remaining counts of the indictment should be dismissed on double jeopardy grounds on the basis of his implied consent to the mistrial.  <u>Id.</u> at 1067-68.

---

[2] As there is no suggestion that the prosecution intentionally provoked a mistrial, the exception to this rule articulated in <u>Oregon v. Kennedy</u>, 456 U.S. 667, 675-76 (1982), is not relevant.

The crux of Petitioners' double jeopardy argument is that they were not given a sufficient opportunity to object to the declaration of a mistrial before the jury was excused.  That contention is not borne out by the record.  Justice Cataldo explicitly asked Petitioners' counsel three times, on the record, if they wished to be heard on the topic of the partial verdict.  First, at the O'Rama conference, the judge asked for counsel's reaction to his "inclination" to declare a mistrial, at which time defense counsel affirmatively stated that he did not wish to be heard.  (A43).  After taking a partial verdict and confirming that the jury had "not reached a decision on any other counts" with respect to Eddy Marte, the court offered counsel an opportunity to be heard; although defense counsel asked about the verdict with respect to Luis Marte, he said nothing about the undecided charge.  (A45-A46).  And again, after the judge took a partial verdict with respect to Luis Marte, he asked if counsel wanted to put anything on the record, but the defense remained silent.  (A47).  In contrast, the Court in Goldstein found implied consent to a mistrial because enough time had passed to allow counsel to voice his objection, even though the record did not indicate that the trial court ever solicited counsel's position.  479 F.2d at 1066 ("As anyone familiar with trial court procedure knows, [bringing in the jury, taking a partial verdict, and polling the jury] took

20

considerable time.  It was certainly sufficient for defense
counsel, whose performance up to that time had not been marked
by excessive timidity, to make their changed views [opposing a
mistrial] known to the court.").  Finally, as in Goldstein,
counsel had additional time to object after the court had taken
the partial verdicts and was giving final remarks to the jury.

Petitioners make much of the fact that the trial court
announced only an "inclination" to take a partial verdict and
did not formally declare a mistrial until after the jury was
dismissed.  While the word "inclination" is arguably indefinite,
it unquestionably invited feedback from counsel.  If defense
counsel were unsure whether to agree to a mistrial without
knowing the jury's verdict on Counts One and Two, they should
have conveyed this concern to the judge.  In fact, Petitioners'
stated objection to the mistrial was that the jury could have
continued deliberations on Monday (A48); but that ground was
equally apparent at the time of the O'Rama conference, and
counsel could have then requested that the court give the jury
more time as an alternative to a mistrial.  Moreover, any
question about whether Justice Cataldo planned to follow his
expressed "inclination" was definitively resolved after counsel
for Eddy Marte declined the opportunity to comment at the O'Rama
conference but asked, "Judge, you'll take a partial?" and he
replied, "I'll take a partial verdict."  (A43).  Given that

exchange, the Court cannot discern any possible way counsel could not have known that there would be a mistrial as to Count Three before the jury was brought back to render partial verdicts.  Petitioners concede that "defense counsel have no obligation to object to a mistrial ruling until . . . the trial judge expresses the clear intent to declare a mistrial." (Petitioners' Mem. at 8).  The New York Court of Appeals found, as does this Court, that the judge's intent to declare a mistrial was clear as early as the O'Rama conference.

Immediately following this affirmation, Justice Cataldo proceeded to do exactly what he said he would do – he took a partial verdict.  While the trial court should have officially declared a mistrial prior to dismissing the jury, as explained above, there can be no doubt that all parties understood the fate of Count Three.  Even if Justice Cataldo's intent was not clear at the O'Rama conference, when he began thanking the members of the jury for their service, the only possible conclusion defense counsel could have drawn was that the judge had completed his previously declared course of action – that is, taking a partial verdict and declaring a mistrial as to the remaining count.  If counsel honestly believed that the court was entertaining the possibility of sending the jury back to continue deliberations for another hour on Friday evening, they certainly would not have waited until the jurors had been

dismissed and left the courtroom to inquire about the status of Count Three. Given that understanding, counsel could and should have voiced an objection prior to the dismissal of the jury. The court's initial failure to put its ruling on the record appears to be a mere oversight, not an indication that there was no mistrial ruling or that the ruling was not final.

In considering the totality of the circumstances, the Court finds that counsel's failure to voice any hesitation or objection to a mistrial until after the jury had been dismissed – despite four prior opportunities to do so – signaled Petitioners' consent. Counsel's belated objection, recorded after the jury had been dismissed, was untimely. Thus, this Court holds, as did the New York Court of Appeals, that a state court retrial is not barred by double jeopardy because Petitioners impliedly consented to the mistrial on Count Three. Having so found, the Court need not reach the question of whether there was manifest necessity for the mistrial.

### C.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), a petitioner must obtain a certificate of appealability in order to appeal from "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." Federal prisoners who wish to appeal the denial of habeas relief pursuant to 28 U.S.C. § 2241 need not obtain a certificate of

23

appealability, see Drax v. Reno, 338 F.3d 98, 106 n.12 (2d Cir.
2003), but it is unclear whether the same rule applies to state
detainees.  The Court of Appeals was confronted with, but did
not reach, this issue in Cook v. New York State Division of
Parole, 321 F.3d 274 (2d Cir. 2003).  However, five other
circuits predicate their jurisdiction over state detainee § 2241
appeals on a certificate of appealability.  See Wilson v.
Belleque, 554 F.3d 816, 825 (9th Cir. 2009) (requiring pre-trial
petitioner seeking to bar state retrial on double jeopardy
grounds to obtain a certificate of appealability); Stringer, 161
F.3d at 262 (same); see also Greene v. Tenn. Dep't of Corr., 265
F.3d 369, 372 (6th Cir. 2001) (state prisoner challenging
execution of sentence under § 2241 required to obtain a
certificate of appealability); United States v. Cepero, 224 F.3d
256, 264 (3d Cir. 2000) ("It must be emphasized that it makes no
difference whether 'the final order in a habeas corpus
proceeding in which the detention complained of arises out of
process issued by a State court' described in § 2253(c)(1)(A)
emanates from a proceeding brought under § 2254 or § 2241(c)(3)
. . . .  Under either proceeding, a state prisoner must obtain a
certificate of appealability . . . before appealing from any
aspect of the state-ordered detention under § 2253(c)(1)(A).");
Montez v. McKinna, 208 F.3d 862, 868-69 (10th Cir. 2000).  The
Court of Appeals for the Second Circuit will not act on a

request for a certificate of appealability in a habeas case until the district court has denied the certificate.  Second Cir. Local R. 22.1.  Therefore, the Court assumes that Petitioners' appeal cannot proceed without a ruling on the certificate.

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  The petition's path through the state court system alone demonstrates that reasonable jurists could disagree with this Court's rejection of the double jeopardy argument; in fact, an Associate Justice of the New York Supreme Court, Appellate Division, an Associate Judge of the New York Court of Appeals, and the Chief Judge of the New York Court of Appeals already have.  Additionally, the seemingly open question regarding the appropriate standard of review and the necessity of a certificate of appealability weigh in favor of appellate review.  Thus, a certificate of appealability, to the extent it is required, shall issue.

### III.    Conclusion

The petition for a pre-trial writ of habeas corpus is denied.  The application for a stay of New York state court proceedings is denied as moot.  The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:     New York, New York
           October 17, 2011

                                            John F. Keenan
                                    United States District Judge

26